IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 22-cv-21348

DAWN BARCLAY-ROSS,
FUTURE HEALTH GLOBAL, LLC,
FUTURE HEALTH LIVE, LTD and
FUTURE HEALTH GLOBAL RESPONSE, LTD.,

      Plaintiffs,

v.

ARSENIO IPPOLITO, LUIGI MASELLI,
SANDRO SORIANO, CLINTON RYAN LUCCI,
GIADASTAR, LTD., HEXATREE RESEARCH
LABS, LLC, NEVIA BIOTECH, SRL,
CLINTCORP MEDICAL, LLC, JAI VERMA,
PERSONIFORM, INC. d/b/a "MEDYEAR,"
and PROTECTI Health SOLUTIONS DMCC,

      Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, DAWN BARCLAY-ROSS, FUTURE HEALTH GLOBAL, LLC, FUTURE HEALTH LIVE LTD., and FUTURE HEALTH GLOBAL RESPONSE, LTD. sue ARSENIO IPPOLITO, LUIGI MASELLI, SANDRO SORIANO, CLINTON RYAN LUCCI, GIADASTAR, LTD., HEXATREE RESEARCH LABS, LLC, NEVIA BIOTECH, SRL, CLINTCORP, LLC, JAI VERMA, PERSONIFORM, INC. d/b/a "MEDYEAR," and PROTECTI HEALTH SOLUTIONS DMCC, and say:

## JURISDICTION

1.    This is an action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States in which citizens or subjects of a foreign state are additional parties within the meaning of 28 U.S.C. § 1332(a)(3).

## VENUE

2.      Venue is appropriate in this district in that this action involves causes of action which arose within the U.S. Southern District of Florida.

## PLAINTIFFS

3.      Plaintiff, DAWN BARCLAY-ROSS ("Ms. BARCLAY-ROSS") is and was at all material times a citizen of the United Kingdom.

4.      Plaintiff, FUTURE HEALTH GLOBAL, LLC, ["FUTURE HEALTH (FLA)"] is and was at all material times a limited liability company organized and existing under the laws of the State of Florida.

5.      Plaintiff, FUTURE HEALTH LIVE LTD., ["FUTURE HEALTH (U.K. 1)"] is and was at all material times a corporation organized and existing under the laws of England.

6.      Plaintiff, FUTURE HEALTH GLOBAL RESPONSE, LTD., ["FUTURE HEALTH (U.K. 2)"] is and was at all material times a corporation organized and existing under the laws of England.

7.      The foregoing are sometimes referred to as "the FUTURE HEALTH companies."

## DEFENDANTS

8.      Defendant, ARSENIO IPPOLITO, ("IPPOLITO") is and was at all material times an individual who is sui juris and a citizen of the foreign state of Italy.

9.      Defendant, LUIGI MASELLI ("MASELLI") is and was at all material times an individual who is sui juris and a citizen of the foreign state of Italy.

10.     Defendant, SANDRO SORIANO, ("SORIANO") is and was at all material times an individual who is sui juris and a citizen of the foreign state of Italy.

11.     Defendant, CLINTON RYAN LUCCI, ("LUCCI") is and was at all material times an individual who is sui juris and a citizen of the State of South Carolina.

12.     Defendant, GIADASTAR, LTD., ("GIADASTAR") is and was at all material times a limited liability company notionally organized and existing under the laws of the foreign state of England but which is in reality a shell company used as an engine of fraud and is the alter ego of Defendant, IPPOLITO.

13.     Defendant, HEXATREE RESEARCH LABS, LLC, ("HEXATREE") is and was at all material times a limited liability company notionally organized and existing under the laws of the foreign state of Dubai but which is in reality a shell company used as an engine of fraud and is the alter ego of Defendant, MASELLI.

14.     Defendant, NEVIA BIOTECH, SRL, ("NEVIA BIOTECH") is and was at all material times a limited liability company notionally organized and existing under the laws of the foreign state of Italy but which is in reality a shell company used as an engine of fraud and the alter ego of Defendant, SORIANO.

15.     Defendant, CLINTCORP, LLC, ("CLINTCORP") is and was at all material times a limited liability company notionally organized and existing under the laws of the State of South Carolina but which is in reality a shell company used as an engine of fraud and is the alter ego of LUCCI.

16.     Defendant, JAI VERMA, is and was at all material times an individual who is sui juris and a citizen of the foreign state of Dubai.

17.     Defendant, PERSONIFORM, INC. d/b/a "MEDYEAR," ("MEDYEAR") is and was at all material times a corporation organized and existing under the laws of the State of New York doing business under the fictitious name, "MEDYEAR."

3

18.     Defendant, PROTECTI HEALTH SOLUTIONS DMCC, ("PROTECTI") is and was at all material times a company organized and existing under the rules and regulations of the Dubai Multi Commodities Center of the foreign state of Dubai.

## JURISDICTION

19.     Each Defendant is subject to the general jurisdiction of the courts of this State pursuant to Fla. Stat. § 48.193(2) as having engaged in substantial and not isolated activity within this State, both individually and directly and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

20.     Each Defendant is subject to the specific jurisdiction of the courts of this State, pursuant to Fla. Stat. § 48.193(1)(a)(1) as having operated, conducted, engaged in or carried on a business or business venture in this state, or having an agency in this state, both individually and directly, and further as a result of the actions of agents and co-conspirators which are imputed to each of them.

21.     Each Defendant is subject to the specific jurisdiction of the courts of this State, pursuant to Fla. Stat. Sec. 49.193(1)(a) for breaching a contract in this state by failing to perform acts required by the contract to be performed in this state.

22.     Each Defendant is further subject to the specific jurisdiction of the courts of this State pursuant to Fla. Stat. § 48.193(1)(a)(2) as having committed tortious acts within this State, both individually and directly, and further as a result of the actions of agents and co-conspirator which are imputed to them.

23.     As a result of each of their individual and direct actions and further as a result of the actions of their agents and co-conspirators which are imputed to each of them, all Defendants

have sufficient minimum contacts with this State that haling them before the courts of this State would not offend Constitutional due process requirements.

## FACTS

**The Joint Venture:**

24.      Ms. BARCLAY-ROSS has since 2008 been engaged in the business of staging international multi sector conventions and specifically medical conventions and she and her company FUTURE HEALTH (U.K.1) had developed an excellent reputation in the field and had amassed a large roster of clients and contacts, including sellers and purchasers of medical devices.

25.      During the height of the world-wide Covid pandemic in 2020, 2021 and 2022 there was an enormous demand for Covid tests and associated products.

26.      The Acon Group based in California with a manufacturing base in China had developed the "Flowflex" Covid test kit which was for sale globally and was in great demand.

27.      In or around late November 2021, Ms. BARCLAY-ROSS was introduced to MASELLI by one Kresimir Svgir, who in turn introduced her to his partner IPPOLITO.

28.      IPPOLITO represented to her that he was part of a consortium comprised of MASELLI, SORIANO and himself and their respective companies, GIADASTAR, HEXATREE and NEVIA BIOTECH, in which NEVIA BIOTECH allegedly held the EU distribution rights for Acon's Flowflex test kit. (The foregoing three individuals and their respective alter ego companies are sometimes collectively referred to herein as the "Defendant Joint Venture Partners").

29.      The Defendant Joint Venture Partners proposed to Ms. BARCLAY-ROSS and FUTURE HEALTH (U.K.2) that they enter into a mutually beneficial arrangement to sell medical products globally and, particularly relevant for present purposes Acon's Flowflex test kits in the United States.

30.     The Joint Venture Partners proposed to Ms. BARCLAY-ROSS that:

(a)     they and she and her companies all pool their sales contacts;

(b)     through the Joint Venture Partners' close relationship with Acon's Chinese principal the product would be bought directly from Acon's Chinese factory;

(c)     the Joint Venture Partners and their agents would actively sell the product;

(d)     Ms. BARCLAY-ROSS's U.K company would handle the European finances and her Florida company would handle the U.S. finances and would receive and remit the payments due as directed by the Joint Venture Partners; and

(e)     with particular reference to the Flowflex test kits, Ms. BARCLAY-ROSS, for each order received, would be personally entitled to retain 20 cents on each test kit sold.

31.     Ms. BARCLAY-ROSS agreed, and the parties entered into what was stated to be a "Joint Venture Agreement" on December 20, 2021, a copy of which is attached as Exhibit "A."

32.     This initial agreement was an outline only and nominally between Ms. BARCLAY-ROSS, FUTURE HEALTH (U.K. 2) and the Defendant Joint Venture Partners but was intended by the parties to cover the other FUTURE HEALTH companies, too, and was supplemented over the course of dealing to that effect with oral terms agreed by telephone, written terms exchanged by email, text and WhatsApp, and otherwise by the course of dealing between the parties.

33.     However, from subsequent events, Ms. BARCLAY-ROSS believes that the only real "Joint Venture" which was ever in existence was an existing one between the Defendant Joint Venture Partners who did not intend to honor any joint venture arrangement with her or with the FUTURE HEALTH companies.

34.    Pursuant to the Agreement, the FUTURE HEALTH companies in England and Florida started to receive money paid into their bank accounts, ostensibly with regard to medical supplies ordered and paid for in Europe and the United States and the two companies remitted payments to suppliers, introducers, and to the Defendant Joint Venture Partners accordingly as directed, principally by IPPOLITO.

35.    At or about this time, the Plaintiffs also entered into a contract with Defendants, JAI VERMA and PROTECTI.

36.    JAI VERMA had allegedly held high executive positions in the Cigna healthcare group and other respected companies in the international healthcare industry. He claimed to be a principal of PROTECTI and MEDYEAR and involved in various healthcare services and healthcare IT businesses around the globe.

37.    Through her long background in staging medical conferences Ms. BARCLAY-ROSS, and her companies, had many potential buyers for medical products.

38.    JAI VERMA represented to the Plaintiffs that, through his company, PROTECTI, he could supply the Plaintiffs' potential buyers with several different Covid-related products, including Abbot Pan Bio Test Kits, Abbott Binax Now! Test Kits, Carestart Test Kits, Flowflex FDA, EUA approved test kids, Astra Zeneca Vaccines, Sputnik V and Sputnik Lite Vaccines and Zerovir and Favipavovir Tablets.

39.    In discussions in December 2021, JAI VERMA promised Ms. BARCLAY-ROSS and the FUTURE HEALTH companies that they would be compensated on all sales which flowed through introductions to buyers of product to him and PROTECTI, that she and her companies would be compensated at agreed rates for various products, that all the parties would keep such

7

contacts and other proprietary information confidential, and that the parties would not circumvent each other by bypassing them and effecting sales through their affiliates or by other means.

40.     On December 27, 2021, FUTURE HEALTH (U.K. 2), as "**Buyer**" therefore, entered into a Non-Circumvention & Non-Disclosure Agreement with PROTECTI, as "**Seller**," for the "**Purpose**," as defined in paragraph 1 thereof of "evaluating, considering and negotiating one or more agreements between the Parties pursuant to which **Buyer** intends to purchase consignments of Zerovir (Molnupiravir) tablets, other general pharma products, including but not limited to test kits, Sputnik V and Sputnik Light, and other COVID-19 vaccines from **Seller** on mutually agreed terms." A copy is attached as Exhibit "B."

41.     The agreement protected FUTURE HEALTH (U.K. 2), and its affiliates, the other FUTURE HEALTH companies, against unauthorized disclosure and circumvention in the following terms, at paragraph 9.1, as follows:

**9.      Non-Circumvention**

9.1.    Each of the parties separately undertakes to the other that except in concert with the other or with their express prior written approvals, it shall not, directly or indirectly:

(a)      itself approach any of the others affiliates, partners, introductions or contacts in relation to the Purpose;

(b)      induce, solicit, procure or otherwise encourage any third party to take any action which would interfere with the Purpose or prejudice the commercial interests of the other parties;

(c) seek, encourage or respond to any approach from any third party to pursue the Purpose or for any related reason which involves the same partners or introductions made by any of the others or the same or substantially similar resources, technology or work product as the Purpose of this Agreement.

9.2      Each of the parties shall procure that any and all of its officers, employees, agents, advisers and other representatives, and any Group Company and their respective offers(*sic*), employees, agents, advisers and other representatives, comply with clause 9.1 as if they were a party to this agreement.

42.     The other FUTURE HEALTH companies were therefore intended third-party beneficiaries of the agreement.

43.     This agreement mirrored a substantially identical Non-Circumvention & Non-Disclosure Agreement focused on other products between FUTURE HEALTH (U.K. 2) and MASELLI and HEXATREE the previous month.

44.     On November 29, 2021, FUTURE HEALTH (U.K. 2), as "**Buyer**" entered into a Non-Circumvention & Non-Disclosure Agreement with HEXATREE as "**Seller**," for the "**Purpose**," as defined in paragraph 1 thereof of "evaluating, considering and negotiating one or more agreements between the Parties pursuant to which **Buyer** intends to purchase consignments of Sputnik Light COVID-19 vaccines from **Seller** on mutually agreed terms." A copy is attached as Exhibit "C."

45.     The agreement protected FUTURE HEALTH (U.K. 2), and its affiliates, the other FUTURE HEALTH companies, against unauthorized disclosure and circumvention in the following terms, at paragraph 9.1, as follows:

**9.      Non-Circumvention**

9.1.    Each of the parties separately undertakes to the other that except in concert with the other or with their express prior written approvals, it shall not, directly or indirectly:

(a)      itself approach any of the others affiliates, partners, introductions or contacts in relation to the Purpose;

(b)      induce, solicit, procure or otherwise encourage any third party to take any action which would interfere with the Purpose or prejudice the commercial interests of the other parties;

(c) seek, encourage or respond to any approach from any third party to pursue the Purpose or for any related reason which involves the same partners or introductions made by any of the others or the same or substantially similar resources, technology or work product as the Purpose of this Agreement.

9.2      Each of the parties shall procure that any and all of its officers employees, agents, advisers and other representatives, and any Group Company and their respective

offers(*sic*), employees, agents, advisers and other representatives, comply with clause 9.1 as if they were a party to this agreement.

46.     The other FUTURE HEALTH companies were therefore intended third-party beneficiaries of the agreement.

**Discovery of the Fraud:**

47.     The business relationship between all of the parties was of very short duration. The Plaintiffs very quickly became aware that there were serious problems with the business of the "Joint Venture" and the Defendant Joint Venture Partners and in their dealings with JAI VERMA and PROTECTI.

48.     Upon developing information and belief, the entire "Joint Venture" business appears to have consisted in part of:  (a) a fraud perpetrated on third-party buyers by the Defendants to take their money for no product or counterfeit product; (b) and/or a money-laundering scheme unrelated to medical supply, and/or (c) to the extent that there were genuine sales of medical product, sales which had been routed around the FUTURE HEALTH companies by the Defendants acting in concert in order to circumvent the obligation to pay Ms. BARCLAY-ROSS and her companies the agreed commissions.

49.     Upon developing information and belief, it also appears that JAI VERMA and PROTECTI and its affiliate MEDYEAR never intended to pay the Plaintiffs any portion of the proceeds for their efforts in introducing buyers to JAI VERMA and PROTECTI and that upon information and belief JAI VERMA and PROTECTI made millions of dollars from sales to buyers introduced by the Plaintiffs.

50.     It is believed on the totality of the circumstances that there was an interlocking relationship between all the Defendants, who jointly engaged in an overall fraudulent scheme, variously as principals, co-conspirators and aiders and abettors.

51.     There were so many lies and fake documents generated by the various Defendants that it is impossible before discovery to winnow out what was true from what was false. Plaintiffs therefore make the following allegations on the basis of information and belief.

**(a)     Fraudulent "Sales:"**

52.     To the best of the Plaintiff current understanding, the corporate Defendant Joint Venture Partners are all shell companies which have no real existence separate from their owners and are all used in attempt to shield the principals from liability, whose separate corporate existence should therefore be disregarded.

53.     IPPOLITO, MASELLI, SORIANO and their respective alter egos companies, GIADASTAR, HEXATREE and NEVIA BIOTECH, apparently had an agent, LUCCI, in the U.S., in South Carolina, who would supposedly take orders from customers in the U.S. through his own shell company, CLINTCORP, receive the money for product and arrange for delivery.

54.     The existence of LUCCI and CLINTCORP and the role that they played was not initially known to the Plaintiffs, but some aspects of their involvement became clear over time.

55.     Pursuant to their agreement FUTURE HEALTH [FLA] would receive funds from LUCCI/CLINTCORP on orders he had supposedly placed. The Plaintiff would then be instructed to pay a portion to the "Chinese factory" which was making the supposed Flowflex test kits for Acon, retain 20 cents per kit, and remit the balance to the Defendant Joint Venture Partners and others.

56.     After investigation, which is continuing, to the best of the Plaintiffs' current information and belief: (a) there is no "Chinese factory;" (b) if there is any "Chinese factory" it is not authorized to manufacture medical supplies for Acon; (c) the Defendants have routed approximately $5.4 million dollars through FUTURE HEALTH (FLA)'s account without

supplying more than a derisory amount of product to customers, some of which was water-damaged and all of which is suspected to be counterfeit, exposing the Plaintiffs to a risk of suit; (d) whether these actual "customers" exist is unknown; and (e) to the extent that they do, it is unknown whether they are bona fide commercial buyers or just part of a conspiracy with the Defendant Joint Venture Partners to launder money.

**(b) Fraudulently Circumvented Sales:**

57.    Further upon information and belief, there are an unknown number of actual sales which have been concluded by the Defendants, predominantly on other medical products such as Covid medications, specifically Zerovir and Favipirovir, Covid 19 vaccine orders, and Covid test kits which have not been disclosed to the Plaintiffs and in regard to which the Defendants have not paid any of the money due to the Plaintiffs.

58.    Before discovery, Plaintiffs do not know the full extent to which they have been circumvented. However, the Plaintiffs have seen various allocation contracts which the Defendant MASELLI obtained through fraudulent use of the FUTURE HEALTH name and a fake signature for Ms. BARCLAY-ROSS, which she did not authorize.

59.    MASELLI had no position within the FUTURE HEALTH companies but achieved the foregoing objective by fraudulently representing that he was the "Chief Medical Officer of FUTURE HEALTH in the U.S.A." and using the FUTURE HEALTH email account to which he had access and by using Ms. BARCLAY-ROSS's electronic signature which he was not authorized to use.

60.    One example of an allocation so procured on behalf of FUTURE HEALTH (U.K. 2) was for the supply of 30 million I-health test kits per month from the supplier. Sales of such a volume of product would have resulted in a commission to the Plaintiff, at twenty cents per test

kit sold, and orders received, equal to $6,000,000 per month. It is unknown before discovery what volume of product was sold. No commissions were paid to the Plaintiffs.

61.     There were several other instances where Plaintiffs introduced bona fide intending purchasers, including purchasing agents for foreign governments, directly to the Defendants, which Plaintiffs believe should in all probability have resulted in sales, but which the Defendants claimed were either never supplied or even responded to. It is impossible before discovery to determine where the truth on this lies.

62.     On March 7, 2022, Ms. BARCLAY-ROSS – apparently accidentally – received an email referring to a "22 Million i Health contract" for test kits from the supposed "Chinese Factory" which was copied to JAI VERMA and other Defendants.

63.     On another occasion Ms. BARCLAY-ROSS identified on the work in progress spreadsheet passed to her by MASELLI that JAI VERMA's company MEDYEAR was the purchaser of Flowflex test kits and the seller was a shell company, "Big Apple Goods Wholesalers," owned by MASELLI, further indicating circumvention of the Plaintiffs.

64.     Upon information and belief, sales destined for the U.S. were routed by JAI VERMA through MEDYEAR so that it would not be apparent that JAI VERMA and PROTECTI were in breach of the parties' Non-Circumvention and Non-Disclosure Agreements. Similarly, sales for other territories appear to have been made through MASELLI'S company, Big Apple Goods Wholesalers and other vehicle companies.

65.     After entry into the FUTURE HEALTH/PROTECTI Non-Circumvention & Non-Disclosure Agreement, the Plaintiffs introduced several buyers to JAI VERMA and PROTECTI, all of which stopped contacting the Plaintiffs either shortly after the initial introduction was made or immediately after test orders were delivered.

66.     This was strange, non-commercial behavior and gave rise to a well-founded belief on the part of the Plaintiffs that JAI VERMA and PROTECTI were entering into commercial relationships with such buyers on more advantageous terms on condition that they cease dealing with the Plaintiffs, thus illegally avoiding the payment of commissions. On more than one occasion, potential buyers introduced by the FUTURE HEALTH companies alerted Ms. BARCLAY-ROSS that JAI VERMA was attempting to circumvent her companies by making sales while cutting them out.

67.     The FUTURE HEATH companies introduced several potential buyers to JAI VERMA and PROTECTI which placed small test orders as precursors to much larger orders. Although the test orders were fulfilled, none of the large orders which – in a market where there was huge demand and very restricted supply - should thereafter have been placed, were, according to JAI VERMA and PROTECTI ever placed.

68.     PROTECTI failed to pay commissions to any of the Plaintiffs on the sale of any product with the exception of commissions on a very small test order for the Government of Benin, and on a small test order for a FUTURE HEALTH client which supplied medical products to the whole of the U.S. maritime cruise industry.

69.     From the totality of the circumstances, it became apparent to the Plaintiffs after just a couple of months that JAI VERMA and PROTECTI never intended to pay any money to the Plaintiffs but were fraudulently inducing them to give up their proprietary information without payment for such Defendants' commercial advancement. They were willing to pay tiny commissions on very small test orders, but only as a way to gain market access and to keep for themselves the entire sales price on the huge orders that would ensue.

70.     It also began to be apparent to the Plaintiffs that there was linkage between the two "arms" of the conspiracy, one being the fraudulent U.S. operation conducted by the Joint Venture Partners, including MASELLI and HEXATREE and the other being the supply of real product and circumvention by JAI VERMA, and his companies, PROTECTI and MEDYEAR.

71.     Examples are given above at paras. 62 and 63.

72.     A further example is the fact that MASELLI, who had allegedly been resident in Italy, which was the base of operations of his company HEXATREE, upon information and belief moved to Dubai in January of 2022 to join forces and operations with JAI VERMA.

73.     MASELLI told Ms. BARCLAY-ROSS that he was meeting VERMA of PROTECTI and Mr. Vinay Maloo of the Enso Group, a major supplier of the Sputnik V and Sputnik Lite vaccines and other pharma products, on January 27, 2022 and MASELLI sent her a photograph of the three of them together.

74.     JAI VERMA told Ms. BARCLAY-ROSS that PROTECTI had large allocations of the Sputnik V and Sputnik Lite vaccines as well as other vaccines such as Pfizer and AstraZeneca and test kits via the Enso Group. JAI VERMA also claimed to have access to or allocations for other pharma products and medical devices via Finosso, which owns Vivimed Pharma Private PVT Ltd., ("Vivimed") in India, the manufacturer of the Zerovir and Favipavovir tablets. JAI VERMA was pushing Ms. BARCLAY-ROSS to introduce potential buyers to him for these products in particular to be supplied via this trio of companies, all of which were connected to JAI VERMA by way of ownership, contract and close family connections.

75.     January 27, 2022, marked a change in the attitude of MASELLI to Ms. BARCLAY-ROSS. Instead of being cooperative, he began to be aggressive, defensive and even rude.

76.     IPPOLITO later told her that a joint venture deal had been struck that day between MASELLI, JAI VERMA and the Enso Group, in breach of the existing contracts, cutting out and circumventing the FUTURE HEALTH companies, and that deals on vaccines and test kits had subsequently been concluded.

77.     The Plaintiffs have accordingly stopped any continuing commercial involvement with the Defendants.

78.     Plaintiffs have retained the undersigned attorneys and are obliged to pay them a reasonable fee.

79.     All conditions precedent have been performed, otherwise satisfied or waived.

## COUNT I
## FRAUD

Plaintiffs reallege paragraphs 1 through 79 against all Defendants and further allege:

80.     The entire basis of the relationship which the Plaintiffs entered into with the Defendants was based on the premise that they were engaged in a mutually beneficial relationship centered on the completely legal purchase and sale of medical products.

81.     In fact, the Defendants were engaged in a conspiracy to defraud the Plaintiffs in the ways detailed above.

82.     Had Ms. BARCLAY-ROSS been told the truth, she, as principal of the three FUTURE HEALTH companies, would not have had them enter into the joint venture agreement or the Non-Circumvention Agreements, which were all procured by fraud.

83.     The Defendants' fraud has been the proximate cause of damage to all three Plaintiffs, namely: (a) the destruction of their personal and corporate credibility, goodwill and reputation; (b) the sterilization of their ability to continue to do business in the medical field for an unknown number of years; (c) deprivation of the value of the agreed share of the business actually

done; and (d) forced Ms. BARCLAY-ROSS to withdraw from ongoing negotiations to sell the companies.

84. Before discovery, the total amount of the loss caused is unknown but is estimated at being in excess of $10 million.

85. Such conduct was willful and wanton and deserving of an award of punitive damages in such sum as the jury shall decide will deter such conduct in the future in accordance with Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, punitive damages, interest, costs and such further or other relief as the Court determines to be just and proper.

**COUNT II**
**CONSPIRACY TO DEFRAUD**

Further or alternatively, Plaintiffs reallege paragraphs 1 through 79 against Defendants and further allege:

86. As a result of the facts detailed above, the Defendants agreed and conspired with each other to defraud the Plaintiffs of their property and so cause them damage.

87. Each Defendant knowingly assisted the others in such fraud by the commission of numerous overt acts, namely through telephone calls, emails, and WhatsApp messages and the preparation of forged and fraudulent documents in furtherance of the unlawful scheme and they are therefore jointly and severally liable for the loss caused to the Plaintiffs.

88. Before discovery, the total amount of the loss caused is unknown but is estimated at being in excess of $10 million.

89.     Such conduct was willful and wanton and deserving of an award of punitive damages in such sum as the jury shall decide will deter such conduct in the future in accordance with Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, punitive damages, interest, costs and such further or other relief as the Court determines to be just and proper.

## COUNT III
## CIVIL THEFT

Further or alternatively, Plaintiffs reallege paragraphs 1 through 79 against Defendants and further allege:

90.     The offense of theft under Florida law consists of "obtaining" or "using" the property of another which is defined, disjunctively, as any and all of the following:

(a)     Taking or exercising control over property. [see Fla. Stat. § 812.012(3)(a)].

(b)     Making any unauthorized use, disposition, or transfer of property. [see Fla. Stat. § 812.012(3)(b)].

(c)     Obtaining property by fraud, willful misrepresentation of a future act, or false promise. [see Fla. Stat. § 812.012(3)(c)].

(d)     Conduct previously known as stealing; larceny; purloining; abstracting; embezzlement; misapplication; misappropriation; conversion; or obtaining money or property by false pretenses, fraud, or deception. [see Fla. Stat. § 812.012(3)(d)(1)].

(e)     Other conduct similar in nature. [see Fla. Stat. § 812.012(3)(d)(2)].

91.     "Property" within the meaning of the statute means anything of value, and includes tangible or intangible personal property, including rights, privileges, interests, and claims. [see Fla. Stat. § 812.012(4)(b)].

92.     "Property of another" within the meaning of the statute means property in which a person has an interest upon which another person is not privileged to infringe without consent, whether or not the other person also has an interest in the property. [see Fla. Stat. § 812.012(5)].

93.     By reason of the matters aforesaid, Defendants committed theft under Florida law in that they knowingly, and with criminal intent, obtained or used the property of the Plaintiffs with the intent of depriving them of a right to the property or a benefit from the property contrary to Fla. Stat. § 812.014(1)(a).

94.     Further or alternatively, by reason of the matters aforesaid, Defendants committed theft under Florida law in that they knowingly, and with criminal intent, appropriated the property of the Plaintiffs to their own use or to the use of persons not entitled to the use thereof, contrary to Fla. Stat. § 812.014(1)(b).

95.     The nature and value of the property stolen consists of (a) destruction of the personal and corporate credibility, goodwill and reputation of the Plaintiffs; (b) sterilization of their ability to continue to do business in the medical field for an unknown number of years; (c) deprivation of the value of the agreed share of the business actually done; (d) the destruction of the sale value of the FUTURE HEALTH companies.

96.     Before discovery, the total amount of the loss caused is unknown but is estimated at being in excess of $10 million.

97.     By reason of the foregoing matters alleged, Plaintiffs are entitled to the civil remedies set forth in Florida Stat § 772.11, including treble damages, attorneys' fees and the expenses of this action.

98.     This remedy is cumulative to all other remedies pursuant to Florida Stat § 772.18.

99.     All conditions precedent to this action, including statutory notice, have been

complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand against Defendants three times the damage suffered, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

**COUNT IV**
**CIVIL THEFT - CONSPIRACY**

Further or alternatively, Plaintiffs reallege paragraphs 1 through 79 against Defendants and further allege:

100.    As a result of the facts detailed above, the Defendants agreed and conspired with each other to obtain or use the Plaintiffs' property with the criminal intent of depriving the Plaintiffs of a right to the property or a benefit from the property.

101.    Each Defendant knowingly assisted the others in such deprivation by the commission of numerous overt acts, namely through telephone calls, emails, and WhatsApp messages and the preparation of forged and fraudulent documents in furtherance of the unlawful scheme and they are therefore jointly and severally liable for the loss caused to the Plaintiffs.

102.    As detailed above, the foregoing Defendants with criminal intent, therefore conspired and agreed together to commit theft by the terms of Fla. Stat. § 812.014, and so committed theft, and Plaintiffs are entitled to the civil remedies set forth in Fla. Stat. § 772.11, including treble damages, attorneys' fees and the expenses of this action.

103.    Co-conspirators are principal violators under the Theft Act. See, Fla. Stat. § 777.011.

104.    Before discovery, the total amount of the loss caused is unknown but is estimated at being in excess of $10 million.

105.    This remedy is cumulative to all other remedies pursuant to Florida Stat § 772.18.

106.    All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand against Defendants three times the damage suffered, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

**COUNT V**
**CIVIL THEFT - AIDING AND ABETTING**

Further or alternatively, Plaintiffs reallege paragraphs 1 through 79 against Defendants and further allege:

107.    As a result of the facts detailed above, each Defendant rendered substantial assistance to the others by affirmatively assisting in the furtherance of the theft, knowingly and with criminal intent, and each is therefore jointly and severally liable as an aider and abettor for the loss caused to the Plaintiffs.

108.    Aiders and abettors are principal violators under the Theft Act. See, Fla. Stat. § 777.011.

109.    Before discovery, the total amount of the loss caused is unknown but is estimated at being in excess of $10 million.

110.    For the foregoing reasons, each of the Defendants, by aiding and abetting the commission of theft, thereby committed theft by the terms of Fla. Stat. § 812.014 and Plaintiffs are entitled to the civil remedies set forth in Fla. Stat. § 772.11, including treble damages, attorneys' fees and the expenses of this action.

111.    This remedy is cumulative to all other remedies pursuant to Florida Stat § 772.18.

112.    All conditions precedent to this action, including statutory notice, have been complied with, waived, or have been otherwise satisfied.

WHEREFORE, Plaintiffs demand against Defendants three times the damage suffered, plus interest, and such further and other legal and equitable relief as may appear just, plus the attorneys' fees, costs and expenses of this action.

**COUNT VI**
**BREACH OF FIDUCIARY DUTY**

Further or alternatively, Plaintiffs reallege paragraphs 1 through 79 against Defendants and further allege:

113.     Under the terms of contracting which tied them together the Defendants were the Plaintiffs' fiduciaries and owed them the highest duty of care known to the law.

114.     By reason of the matters alleged, Defendants breached their fiduciary duty to the Plaintiffs and proximately caused them in excess of $10 million in damages.

115.     Such conduct was willful and wanton and deserving of an award of punitive damages in such sum as the jury shall decide will deter such conduct in the future in accordance with Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, interest, costs and such further or other relief as the Court determines to be just and proper.

**COUNT VII**
**ACCOUNTING**

Further or alternatively, Plaintiffs reallege paragraphs 1 through 79 against Defendants and further allege:

116.     As the Plaintiffs' fiduciaries, the Defendant Joint Venture Partners owed the Plaintiffs a duty to account for the finances of their mutual venture. They have never done so but have instead stolen and misapplied its assets.

117.    Moreover, pursuant to the Non-Circumvention & Non-Disclosure Agreement JAI VERMA and PROTECTI owed the Plaintiffs a duty to account for the proceeds from sales of buyers introduced by the Plaintiffs. They have never done so and have, upon information and belief circumvented the Plaintiffs and kept all income for themselves.

WHEREFORE, Plaintiffs demand that the said Defendants account to them in equity for all the financial transactions conducted or that should have been conducted in accordance with their agreements and that they be surcharged for all unpaid, missing, unauthorized and misapplied sums as such accounting may show, and for such further or other relief as the Court determines to be just and proper, including costs in equity.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand trial by jury on all issues so triable as a matter of right and as to all claims as sound in equity, an advisory jury in equity.

Respectfully submitted,

Aballí Milne Kalil, P.A.
*Counsel for Plaintiffs*
One Southeast Third Avenue, Suite 2250
Miami, Florida 33131
Telephone: (305) 373-6600
Facsimile: (305) 373-7929
Email: hmilne@aballi.com
Email: gsmith@aballi.com

*/s/  Hendrik G. Milne*
Hendrik G. Milne, Esq.
Florida Bar No. 335886